Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

**CIRCUIT COURT OF MISSOURI**
**SIXHTHEENTH JUDICIAL CIRCUIT**
**JACKSON COUNTY**

ROBERT RUTH, individually and on behalf of all others similarly situated,

       *Plaintiff,*

  v.

MALLINCKRODT LLC, MALLINCKRODT ENTERPRISES LLC, and MALLINCKRODT BRAND PHARMACEUTICALS, INC.,

       *Defendants.*

Case No.

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Charles F. Speer – MO Bar # 40713
cspeer@speerlawfirm.com
SPEER LAW FIRM, P.A.
104 West 9th Street, Suite 400
Kansas City, MO 64105
Tel: 816.472.3560

William S. Consovoy*
will@consovoymccarthy.com
Thomas R. McCarthy*
tom@consovoymccarthy.com
CONSOVOY MCCARTHY PARK PLLC
3033 Wilson Boulevard, Suite 700
Arlington, Virginia 22201
Tel: 703.243.9423

Ashley Keller*
ack@kellerlenkner.com
Travis Lenkner*
tdl@kellerlenkner.com
Seth Meyer*
sam@kellerlenkner.com
KELLER LENKNER LLC
150 North Riverside Plaza, Suite 5100
Chicago, Illinois 60606
Tel: 312.506.5641

James Young*
jyoung@ForThePeople.com
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
76 South Laura Street, Suite 1100
Jacksonville, Florida 32202
Tel: 904.398.2722

John A. Yanchunis*
jyanchunis@ForThePeople.com
Patrick A. Barthle II*
pbarthle@ForThePeople.com
Juan Martinez*
juanmartinez@ForThePeople.com
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
North Franklin Street, 7th Floor
Tampa, Florida 33602
Tel: 813/223-5505

*Pro Hac Vice* admission to be sought

*Counsel for Plaintiff and the Putative Class*

# EXHIBIT A

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

PARTIES ............................................................................................................... 3

JURISDICTION AND VENUE ............................................................................ 5

FACTUAL ALLEGATIONS ............................................................................... 6

    A.    Because Opioids Are Highly Addictive, Prevailing Medical Norms Dictated That They Should Not Be Prescribed for Chronic Pain. .......................................... 6

    B.    Mallinckrodt Falsely Trivialized, Mischaracterized, and Failed to Disclose the Known, Serious Risk of Addiction and Overstated Opioids' Effect on Patients' Function and Quality of Life. ................................................................................... 7

    C.    Mallinckrodt Made Misrepresentations Regarding Abuse-Deterrence. ......................... 13

    D.    Mallinckrodt Directed Front Groups to Promote Opioid Use and Combat Efforts to Restrict Opioid Prescribing. ........................................................................... 15

    E.    Mallinckrodt Told Doctors that Opioids Could be Taken in Ever Higher Doses without Disclosing their Greater Risks. ................................................................... 21

    F.    Mallinckrodt Failed to Put into Place Proper Procedures to Report Suspicious Orders of Opioids. ............................................................................................ 22

    G.    Mallinckrodt Fueled and Profited from a Public Health Epidemic That Has Significantly Harmed Missouri Residents. .................................................................. 29

    H.    Mallinckrodt Fraudulently Concealed its Misconduct. ................................................. 35

    I.    Missouri Purchasers of Health-Care Insurance Have Sustained Substantial Harm Due to the Defendants' Misconduct. ................................................................... 36

    J.    Defendants Acted Wantonly, Willfully, Outrageously, and with Reckless Disregard for the Consequences of Their Actions. ............................................................ 39

FACTS SPECIFIC TO PLAINTIFF ................................................................... 41

CLASS ALLEGATIONS ..................................................................................... 42

CAUSES OF ACTION ........................................................................................ 44

    COUNT I: Violations of Missouri Merchandising Practices Act, Mo. Rev. Stat. Ann. § 407.010, et seq. ............................................................................... 44

    COUNT II: Public Nuisance ......................................................................... 46

i

# EXHIBIT A

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

COUNT III: Unjust Enrichment ................................................................. 48

COUNT IV: Negligence ............................................................................ 48

COUNT V: Civil Conspiracy (Missouri Common Law).............................................. 49

COUNT VI: Fraud and Fraudulent Misrepresentation ................................................. 50

PRAYER FOR RELIEF ........................................................................................ 52

JURY TRIAL DEMANDED....................................................................................... 54

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

Plaintiff Robert Ruth ("Plaintiff") is a natural person and resident of Missouri. Plaintiff brings this Class Action Complaint ("Complaint") against Defendants Mallinckrodt LLC, Mallinckrodt Enterprises LLC, and Mallinckrodt Brand Pharmaceuticals, Inc. (collectively, "Mallinckrodt" or "Defendants"), seeking redress for Defendants' alleged illegal acts that have caused Plaintiff's health insurance premiums to increase. Plaintiff, for his Complaint, alleges as follows upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

## INTRODUCTION

1.     Prescription opioids have devastated communities across the country and in the State of Missouri. Since 1999, there have been more than 183,000 reported opioid-related deaths nationwide—more than three times the number of U.S. soldiers who died in the Vietnam War. In addition to the tragic loss of life and the heartbreaking impact on children and loved ones, some estimates state that the opioid crisis is costing governmental entities and private companies as much as $500 billion per year.

2.     Mallinckrodt manufactures, markets, and sells, prescription opioids, which are powerful, highly addictive narcotic painkillers. Defendants have engaged in a cunning and deceptive marketing scheme to encourage doctors and patients to use opioids to treat chronic pain. In doing so, Defendants falsely minimized the risks of opioids, overstated their benefits, and generated far more opioid prescriptions than there should have been.

3.     The opioid epidemic is the direct result of Defendants' deliberately crafted, well-funded campaign of deception. For years, they misrepresented the risks posed by the opioids they manufacture and sell, misleading susceptible prescribers and vulnerable patient populations. As

1

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

families and communities suffered from the scourge of opioid abuse, Defendants earned billions in profits as a direct result of the harms they imposed.

4.      Mallinckrodt knew that their misrepresentations about the risks and benefits of opioids were not supported by, and sometimes were directly contrary to, the scientific evidence. Certain opioid manufacturers, including Mallinckrodt, have entered agreements prohibiting them from making misrepresentations identified in this Complaint in other jurisdictions. Nonetheless, the Defendants continue to misrepresent the risks and benefits of long-term opioid use in Missouri, and they have not corrected their past misrepresentations.

5.      Mallinckrodt's false and misleading statements deceived doctors and patients about the risks and benefits of opioids and convinced them that opioids were not only appropriate, but *necessary* to treat chronic pain. Mallinckrodt targeted susceptible prescribers, like family doctors, and vulnerable patient populations, like the elderly and veterans. And they tainted the sources that doctors and patients relied upon for guidance, including treatment guidelines, medical education programs, medical conferences and seminars, and scientific articles. As a result, they successfully transformed the way doctors treat chronic pain, opening the floodgates of opioid prescriptions and dependence. Opioids are now the most prescribed class of drugs, generating billions of dollars in revenue for Defendants every year.

6.      The explosion in opioid prescriptions and use has created a public health crisis in Missouri. An oversupply of prescription opioids has provided a source for illicit use or sale of opioids, while their widespread use has created a population of addicted and dependent patients. When those patients can no longer afford or legitimately obtain opioids, they often turn to the street to buy prescription opioids or even heroin. In addition to the societal impact of deaths, overdoses, and rampant addiction, Defendants' conduct has created higher demand and thus higher

2

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

prices for opioids, as well as the need for expensive medical treatment for a number of covered health conditions, resulting in increased insurance costs for Missouri residents.

7.      Defendants' conduct has fueled skyrocketing opioid addiction and opioid-related deaths and emergency treatments and has generated huge sales of opioids at inflated prices.

8.      The direct and proximate consequence of Defendants' misconduct is that every Missouri purchaser of private health insurance paid higher premiums, co-payments, and deductibles. Insurance companies have considerable market power and pass onto their insureds the expected cost of future care—including opioid-related coverage. Accordingly, insurance companies factored in the unwarranted and exorbitant healthcare costs of opioid-related coverage caused by Defendants and charged that back to insureds in the form of higher premiums, deductibles, and co-payments.

9.      This action seeks to hold Mallinckrodt accountable for the economic harm they have imposed on Missouri purchasers of private health insurance.

<div align="center">

**PARTIES**

</div>

10.      Plaintiff Robert Ruth is a natural person and resident and citizen of the State of Missouri.

11.      Mallinckrodt LLC and Mallinckrodt Enterprises LLC are limited liability companies organized and existing under the laws of the State of Delaware with their principal places of business in St. Louis, Missouri. Mallinckrodt LLC and Mallinckrodt Enterprises LLC are licensed to conduct business in St. Louis, Missouri. Since June 28, 2013, Mallinckrodt LLC has been a wholly-owned subsidiary of Mallinckrodt, plc. Prior to June 28, 2013 Mallinckrodt LLC was a wholly-owned subsidiary of Covidien plc.

<div align="center">3</div>

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

12.      Mallinckrodt Brand Pharmaceuticals, Inc. is a corporation organized and existing under the laws of the State of Delaware. Mallinckrodt Brand Pharmaceuticals, Inc. is authorized and licensed to conduct business in Missouri with its principal place of business in Hazelwood, Missouri.

13.      Mallinckrodt manufactures and markets two branded opioids: Exalgo, which is an extended-release hydromorphone, sold in 8, 12, 16, and 32 mg dosage strengths, and Roxicodone, which is oxycodone, sold in 15 and 30 mg dosage strengths. In 2009, Mallinckrodt Inc. acquired the U.S. rights to Exalgo. The Food and Drug Administration ("FDA") approved Exalgo for treatment of chronic pain in 2012. Exalgo was designed with properties to make it harder to abuse, but it has not been approved by the FDA to make abuse-deterrent claims. Exalgo is still sold and marketed in Missouri today. Mallinckrodt further expanded its branded opioid portfolio in 2012 by purchasing Roxicodone from Xanodyne Pharmaceuticals. In addition, Mallinckrodt developed Xartemis XR, an extended- release combination of oxycodone and acetaminophen, which the FDA approved in March 2014, and which Mallinckrodt discontinued in August 2015. Mallinckrodt promoted its branded opioid products with its own direct sales force.

14.      While it has sought to develop its branded opioid products, Mallinckrodt has long been a leading manufacturer of generic opioids. Mallinckrodt estimated that in 2015 it received approximately 25% of the U.S. Drug Enforcement Administration's ("DEA") entire annual quota for controlled substances that it manufactures. Mallinckrodt also estimated, based on IMS Health data for the same period, that its generics claimed an approximately 23% market share of DEA Schedules II and III opioid and oral solid dose medications.

15.      Mallinckrodt operates a vertically integrated business in the United States: (1) importing raw opioid materials, (2) manufacturing specialty branded and generic opioid products,

4

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

and (3) marketing and selling its products to drug distributors, specialty pharmaceutical distributors, retail pharmacy chains, pharmaceutical benefit managers that have mail-order pharmacies, and hospital buying groups.

16.     In 2017, Mallinckrodt entered into a settlement with the DEA after their investigation revealed that "Mallinckrodt knew about the diversion [of oxycodone] and sold excessive amounts of the most highly abused forms of oxycodone, 30 mg and 15 mg tablets, placing them into a stream of commerce that would result in diversion." To settle these claims, Mallinckrodt paid a fine of $35 million.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action because the Defendants' principal place of business is in Missouri, the Defendants conduct substantial business in Missouri, and this lawsuit arises out of acts and/or omissions which occurred in Missouri. For example:

(a)     Defendants entered into contracts relating to the subject-matter of this action in the State of Missouri;

(b)     Defendants have delivered, distributed, dispensed, and sold opioids in Missouri with the intent and the expectation that those products would be distributed to or purchased by Missouri residents, citizens, and businesses; and

(c)     As described herein, Plaintiff sues to vindicate injuries that have occurred within the State of Missouri.

18.     Venue is proper in this Court because the Defendants have their place of business in the State of Missouri and conduct business state-wide.

19.     The Complaint herein sets forth exclusively state law claims against Mallinckrodt. Nowhere does Plaintiff plead, expressly or implicitly, any cause of action or request any remedy

5

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

that arises under or is based on federal law. Plaintiff expressly asserts that the only causes of action asserted, and the only remedies sought herein, are founded upon the statutory, regulatory, common, and decisional laws of Missouri.

## FACTUAL ALLEGATIONS

**A.     Because Opioids Are Highly Addictive, Prevailing Medical Norms Dictated That They Should Not Be Prescribed for Chronic Pain.**

20.     Opioids are a class of chemical compounds that bind to opioid receptors in the human nervous system. Opioids elicit a euphoric response by stimulating pleasure centers in the brain. This euphoric response allows opioids to effectively mask pain, but it also causes the drugs to be highly addictive.

21.     Common opioids include morphine, methadone, oxycodone, hydrocodone, codeine, and fentanyl. These drugs cannot be lawfully obtained without a valid prescription. Common brand names for these drugs include Roxicodone, Percocet, and OxyContin. Heroin is also classified as an opioid.

22.     Before the 1990s, generally accepted standards of medical practice dictated that opioids should be used only for cases of acute pain, surgery recovery, cancer treatment, or end-of-life palliative care. There was widespread medical consensus that opioids should not be used to treat chronic pain due to the lack of evidence that opioids improved patients' ability to overcome pain, coupled with evidence of greater pain complaints as patients developed tolerance to opioids over time, and the serious risk of addiction and other side effects.

23.     In the limited cases where patients were prescribed opioids, the drugs ordinarily were administered in closely supervised environments, like inpatient-treatment or hospice facilities, and typically only for short periods of time. These closely supervised conditions

6

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

mitigated the risk that patients might misuse opioids, and they allowed doctors to monitor patients for signs of potential addiction or dependence.

24.      While these prevailing medical norms had strong scientific bases and reflected sound medical judgment, the Defendants viewed the medical community's hesitance to prescribe opioids as an impediment to substantial profits they could obtain from increased use of their opioid products. Thus, Mallinckrodt devised a scheme to misrepresent the risks and benefits of opioids to increase prescriptions by tapping into the large and lucrative market for chronic-pain patients.

**B.    Mallinckrodt Falsely Trivialized, Mischaracterized, and Failed to Disclose the Known, Serious Risk of Addiction and Overstated Opioids' Effect on Patients' Function and Quality of Life.**

25.      Mallinckrodt promoted its branded opioids and opioids generally, in a campaign that consistently mischaracterized the risk of addiction and made deceptive claims about functional improvement. Mallinckrodt conveyed these deceptive messages to Missouri prescribers through sales representatives, patient guides, and branded and unbranded websites and other marketing materials. It also disseminated deceptive messages through third party patient advocacy groups and professional associations who were financially tied to Mallinckrodt but seemed independent and, therefore, credible. Mallinckrodt distributed these messages, or facilitated their distribution, in Missouri with the intent that Missouri prescribers and/or consumers would rely on them in choosing to use opioids in general, and their opioids specifically, to treat chronic pain.

26.      Mallinckrodt relies heavily on its sales representatives to convey its marketing messages and materials to prescribers in targeted, in-person settings. Not surprisingly, Mallinckrodt's sales representatives visited prescribers in Missouri. Publicly available Open

7

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

Payments Data[1] shows that in 2017 alone, Mallinckrodt sales representatives visited Missouri prescribers at least 872 times, in visits that included some sort of payment[2] to the doctor. This number likely understates the amount of "detailing" by Mallinckrodt sales representatives, as it reflects only visits in which a payment was provided.

27.     Marketing materials also trivialized the risk of opioid addiction. Mallinckrodt's former parent Company, Covidien, published a "patient resource," called "Opioid Safe Use and Handling Guide," which stated that: "Addiction does not often develop when taking opioid pain medicine as prescribed under the guidance of a healthcare provider, but it can occur;" and "Taking more than your prescribed amount of medication to treat your pain is not the same as addiction, but it can be very dangerous."[3] The guide further explains that opioid tolerance is different from addiction, by explaining that tolerance may cause a patient to take more opioids in order to receive pain relief.

28.     Until at least June 2007, Mallinckrodt sponsored pain-topics.org, a now defunct website that proclaimed to be an organization "dedicated to offering contents that are evidence-based, unbiased, non-commercial, and comply with the highest standards and principles of accrediting and other oversight organizations."[4]

29.     The FAQs section of pain-topics.org contained misleading information about a concept called "pseudoaddiction." Pseudoaddiction is a concept invented to foster the

---

[1] Open Payments is a federal program that collects information regarding visits and payments to doctors from pharmaceutical and medical device companies. Pharmaceutical and medical device companies are required to disclose this information under the Physician Payments Sunshine Act in the 2010 Affordable Care Act.

[2] Payments include activities such as promotional speaking, consulting, travel, and meals.

[3] CARES Alliance, "Opioid Safe Use and Handling Guide."

[4] https://web.archive.org/web/20070701065905/http://www.pain-topics.org:80/contacts_aboutus/index.php

8

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

misconception that signs of addiction, including shopping for doctors willing to newly write or refill prescriptions for opioids, or seeking early refills, actually reflected undertreated pain that should be addressed with more opioids—the medical equivalent of fighting fire by adding fuel. Specifically, the pain-topics.org website described pseudoaddiction as behavior that occurs in patients when pain is "undertreated" and includes patients becoming "very focused on obtaining opioid medications, and may be erroneously perceived as 'drug seeking.'"[5]

30.     The website also characterizes as "misinformation" the fact that patients who use opioids for long-term chronic pain become addicted, and questions why the daily administration of medications such as insulin and antidepressants is not considered addiction when the daily administration of opioids is. In addition, the website states that the constant media attention regarding opioid addiction, misuse and overdose creates a "false impression" that opioids should never be prescribed, and the number of "celebrities and street users" along with those who overdose from misuse is minimal in comparison to those who benefit from chronic opioid therapy.[6]

31.     Furthermore, pain-topics.org implies that if a patient is diagnosed with a pain condition and non-opioids fail to provide relief, that patient is "right" for opioids.[7] The website also says that the practice of not using opioids for long-term pain is "nonsensical."[8] It claims that patients who do not legitimately need opioids "do not exhibit obvious causes of pain" or provide other information such as MRIs, medical records, or an event which caused the chronic pain."[9]

---

[5] https://web.archive.org/web/20071026152321/http://pain-topics.org/faqs/index1.php#tolerance (Last visited May 17, 2019.)
[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] *Id.*

9

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

In addition, among its content, the website contained a handout titled Oxycodone Safety for Patients, which advised doctors that "[p]atients' fears of opioid addiction should be expelled."[10] The handout stated the following misleading information regarding the risk of addiction:

## Will you become dependent on or addicted to oxycodone?

☐ After awhile, oxycodone causes *physical dependence*. That is, if you suddenly stop the medication you may experience uncomfortable withdrawal symptoms, such as diarrhea, body aches, weakness, restlessness, anxiety, loss of appetite, and other ill feelings. These may take several days to develop.

☐ This is not the same as *addiction*, a disease involving craving for the drug, loss of control over taking it or compulsive use, and using it despite harm. Addiction to oxycodone in persons without a recent history of alcohol or drug problems is rare.

This handout is still available to prescribers and patients today.

      32.    The FDA does not regulate unbranded advertising or marketing funneled through third-parties. Thus, neither the third-party unbranded materials, such as the information found on pain-topics.org, nor the marketing messages or scripts relied on by Mallinckrodt's sales representatives, were reviewed or approved by the FDA.

      33.    Mallinckrodt's efforts to trivialize the risk of addiction were, and remain, at odds with the scientific evidence. Studies have shown that at least 8-12%, and as many as 30-40% of long-term users of opioids experience problems with addiction. In March 2016, the FDA emphasized the "known serious risk[] of . . . addiction"—"even at recommended doses"—of all opioids."[11] That same month, after a "systematic review of the best available evidence" by a panel

---

[10] Lee A. Kral, Commonsense Oxycodone Prescribing & Safety, http://paincommunity.org/blog/wp-content/uploads/OxycodoneHandout.pdf.

[11] FDA announces safety labeling changes and postmarket study requirements for extended-release and long-acting opioid analgesics, FDA (Sep. 10, 2013); see also FDA announces enhanced warnings for immediate-release opioid pain medications related to risks of misuse, abuse, addiction, overdose and death, FDA (Mar. 22, 2016), available at https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm491739.htm.

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

excluding experts with conflicts of interest, the CDC published the CDC Guideline for prescribing opioids for chronic pain. The CDC Guideline noted that "[o]pioid pain medication use presents serious risks, including overdose and opioid use disorder" (a diagnostic term for addiction).[12] The CDC also emphasized that "continuing opioid therapy for 3 months substantially increases risk for opioid use disorder."[13]

34.     Mallinckrodt also claimed—without evidence—that long-term opioid use would help patients resume their lives and jobs. Mallinckrodt's website, in a section on "responsible use" of opioids, claimed that "[t]he effective pain management offered by medicines helps enable patients to stay in the workplace, enjoy interactions with family and friends, and remain an active member of society."[14]

35.     The Mallinckrodt sponsored pain-topics.org website also claimed that long-term use of opioids for treatment of chronic pain conditions would improve patients' function. The website stated that the benefits of using opioids for chronic pain include improvement to functions such as eating, sleeping, socializing, sexual activity, driving, walking and working. The website also claims that chronic opioid administration improves "quality of life."[15] The website further states that people who do not take opioids for long-term pain are "unable to participate in a normal family, vocational or other desired pursuits."[16]

36.     Mallinckrodt's claims that long-term use of opioids improves patient function and quality of life are unsupported by clinical evidence. There are no controlled studies of the use of

---

[12] CDC Guideline at 2.
[13] *Id.* at 21.
[14] Mallinckrodt Pharmaceuticals, Responsible Use, available at www.mallinckrodt.com/corporate- responsibility/responsible-use.
[15]https://web.archive.org/web/20071025004137/http://pain-topics.org/pdf/OvercomingOpiophobia.pdf
[16] *Id.*

11

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

opioids beyond 12 weeks, and there is no evidence that opioids improve patients' pain and function long-term. On the contrary, the available evidence indicates opioids are not effective to treat chronic pain and may worsen patients' health and pain. Increasing the duration of opioid use is strongly associated with an increasing prevalence of mental health conditions (depression, anxiety, post-traumatic stress disorder, and substance abuse), increased psychological distress, and greater health care utilization.

37.     One pain specialist observed, "opioids may work acceptably well for a while, but over the long term, function generally declines, as does general health, mental health, and social functioning. Over time, even high doses of potent opioids often fail to control pain, and these patients are unable to function normally."[17] Studies of patients who suffer from chronic pain, for example, have consistently shown that patients experienced deteriorating function over time, as measured by ability to return to work, physical activity, pain relief, rates of depression, and subjective quality-of-life measures. Analyses of workers' compensation claims have found that workers who take opioids are almost four times more likely to reach costs over $100,000, stemming from greater side effects and slower returns to work. According to these studies, receiving an opioid for more than seven days also increased patients' risk of being on work disability one year later.

38.     The FDA and other federal agencies have, for years, made clear the lack of evidence for claims that the use of opioids for chronic pain improves patients' function and quality of life.[18]

_____

[17] Andrea Rubinstein, *Are We Making Pain Patients Worse?*, Sonoma Med. (Fall 2009), available at http://www.nbcms.org/about-us/sonoma-county-medical-association/magazine/sonoma-medicine-are-we-making-pain-patients-worse?
[18] The FDA has warned other drug makers that claims of improved function and quality of life were misleading. *See,* Warning Letter from Thomas Abrams, Dir., FDA Div. of Mktg., Adver., & Commc'ns, to Doug Boothe, CEO, Actavis Elizabeth LLC (Feb. 18, 2010), (rejecting claims that

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

The CDC Guideline concludes that "[w]hile benefits for pain relief, function and quality of life with long-term opioid use for chronic pain are uncertain, risks associated with long-term opioid use are clearer and significant."[19] According to the CDC, "for the vast majority of patients, the known, serious, and too-often-fatal risks far outweigh the unproven and transient benefits [of opioids for chronic pain]."[20]

C. **Mallinckrodt Made Misrepresentations Regarding Abuse-Deterrence.**

39. Mallinckrodt oversold its "abuse-deterrent" opioids as a reason that doctors could continue to prescribe their opioids. Mallinckrodt's false and misleading marketing of the benefits of its abuse-deterrent opioids influenced prescribers to discount evidence of opioid addiction and abuse and attribute it to other, "less safe" opioids—thereby prolonging the opioid epidemic.

40. Mallinckrodt promoted both Exalgo (extended-release hydromorphone) and Xartemis XR (oxycodone and acetaminophen) as specifically formulated to reduce abuse. For example, Mallinckrodt's promotional materials stated that "the physical properties of EXALGO may make it difficult to extract the active ingredient using common forms of physical and chemical tampering, including chewing, crushing and dissolving."[21] One member of the FDA's Controlled

---

Actavis' opioid, Kadian, had an "overall positive impact on a patient's work, physical and mental functioning, daily activities, or enjoyment of life."); Warning Letter from Thomas Abrams, Dir., FDA Div. of Mktg., Adver., & Commc'ns, to Brian A. Markison, Chairman, President and Chief Executive Officer, King Pharmaceuticals, Inc. (March 24, 2008), (finding the claim that "patients who are treated with [Avinza (morphine sulfate ER)] experience an improvement in their overall function, social function, and ability to perform daily activities . . . has not been demonstrated by substantial evidence or substantial clinical experience."). The FDA's warning letters were available to Mallinckrodt on the FDA website.

[19] *Id* at 18.

[20] Thomas R. Frieden et al., *Reducing the Risks of Relief— The CDC Opioid-Prescribing Guideline*, 374 New Eng. J. Med. 1501-1504 (2016).

[21] Mallinckrodt Press Release, FDA Approves Mallinckrodt's EXALGO® (hydromorphone HCl) Extended-Release Tablets 32 mg (CII) for Opioid-Tolerant Patients with Moderate-to-Severe Chronic Pain (Aug. 27, 2012), available at

13

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

Substance Staff, however, noted in 2010 that hydromorphone has "a high abuse potential comparable to oxycodone" and further stated that "we predict that Exalgo will have high levels of abuse and diversion."[22]

41.    In addition, with respect to Xartemis XR, Mallinckrodt's promotional materials stated that "XARTEMIS XR has technology that requires abusers to exert additional effort to extract the active ingredient from the large quantity of inactive and deterrent ingredients."[23] In anticipation of Xartemis XR's approval, Mallinckrodt added 150-200 sales representatives to promote it, and CEO Mark Trudeau said the drug could generate "hundreds of millions in revenue."[24]

42.    The CDC Guideline confirms that "[n]o studies" support the notion that "abuse-deterrent technologies [are] a risk mitigation strategy for deterring or preventing abuse," noting that the technologies "do not prevent opioid abuse through oral intake, the most common route of opioid abuse, and can still be abused by non-oral routes."[25] Tom Frieden, the Director of the CDC, reported that his staff could not find "any evidence showing the updated opioids [abuse deterrent opioids] actually reduce rates of addiction, overdoses, or death." [26]

---

http://newsroom.medtronic.com/phoenix.zhtml?c=251324&p=irol-newsArticle&ID=2004159
[22]http://www.fda.gov/downloads/advisorycommittees/committeesmeetingmaterials/
drugs/anestheticandanalgesicdrugproductsadvisorycommittee/ucm187490.pdf at 157-58.
[23] Mallinckrodt, Responsible Use of Opioid Pain Medications (Mar. 7, 2014) at 14.
[24] Samantha Liss, *Mallinckrodt banks on new painkillers for sales*, St. Louis Business Journal (Dec. 30, 2013), available at http://argentcapital.com/mallinckrodt-banks-on-new- painkillers-for-sales
[25] CDC Guideline at 22.
[26] Matthew Perrone, Drugmakers Push Profitable, but Unproven, Opioid Solution, Assoc. Press (Jan. 2, 2017), available at
http://www.detroitnews.com/story/news/nation/2017/01/02/painkillers-drugmakers-addictive/96095558.

14

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

43.     Mallinckrodt promotes patented technology as the solution to opioid abuse and addiction, but none of its "technology" addresses oral ingestion, and its statements regarding abuse-deterrent formulations give the misleading impression that doctors need not worry about the abuse of these opioids. The above representations and resulting implications that Exalgo and Xartemis XR would prevent abuse and were, therefore, safer than other opioids were false and misleading.

**D.    Mallinckrodt Directed Front Groups to Promote Opioid Use and Combat Efforts to Restrict Opioid Prescribing.**

44.     Patient advocacy groups and professional associations have been vehicles for Mallinckrodt to reach prescribers, patients, and policymakers. Mallinckrodt exerted influence and effective control over the messaging by these groups by providing funding directly to them. Mallinckrodt funded Front Groups in order to ensure supportive messages from these seemingly neutral and credible third parties, and their funding did, in fact, ensure such supportive messages— often at the expense of their own constituencies.

45.     "Patient advocacy organizations and professional societies like the Front Groups play a significant role in shaping health policy debates, setting national guidelines for patient treatment, raising disease awareness, and educating the public."[27] "Even small organizations— with 'their large numbers and credibility with policymakers and the public'—have 'extensive influence in specific disease areas.' Larger organizations with extensive funding and outreach capabilities 'likely have a substantial effect on policies relevant to their industry sponsors.'"[28]

---

[27] *Id*. at p. 2.
[28] *Id*.

15

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

46. The U.S. Senate's report, Fueling an Epidemic: Exposing the Financial Ties Between Opioid Manufacturers and Third Party Advocacy Groups,[29] arose out of a 2017 Senate investigation and, drawing on disclosures from other opioid manufacturers, "provides the first comprehensive snapshot of the financial connections between opioid manufacturers and advocacy groups and professional societies operating in the area of opioids policy."[30] The Report found that Front Groups "amplified or issued messages that reinforce industry efforts to promote opioid prescription and use, including guidelines and policies minimizing the risk of addiction and promoting opioids for chronic pain."[31] They also "lobbied to change laws directed at curbing opioid use, strongly criticized landmark CDC guidelines on opioid prescribing, and challenged legal efforts to hold physicians and industry executives responsible for overprescription and misbranding."[32]

47. Upon information and belief, by funding Front Groups, Mallinckrodt was able to exercise control over their false and deceptive messages. Mallinckrodt acted through the Front groups to deceptively promote the use of opioids for the treatment of chronic pain, and to press for policies and legislation that would advance its interests.

48. Founded in 2006, the Alliance for Patient Access ("APA") is a self-described patient advocacy and health professional organization that styles itself as "a national network of physicians dedicated to ensuring patient access to approved therapies and appropriate clinical

---

[29] U.S. Senate Homeland Security & Governmental Affairs Committee, Ranking Members' Office (February 12, 2018) available at https://www.hsdl.org/?abstract&did=808171 ("*Fueling an Epidemic*"), at 1.

[30] *Id.*

[31] *Id.* at 12-15.

[32] *Id.* at 12.

16

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

care."[33] The organization is a Front Group. It is run by Woodberry Associates LLC, a lobbying firm that was also established in 2006.[34] As of January 2018, the APA listed 30 "Associate Members and Financial Supporters," which includes Mallinckrodt.[35]

49.     Among its activities, APA issued a "white paper" titled "Prescription Pain Medication: Preserving Patient Access While Curbing Abuse."[36] Among other things, the white paper criticizes prescription monitoring programs,[37] purporting to express concern that they are burdensome, not user friendly, and of questionable efficacy:

> Prescription monitoring programs that are difficult to use and cumbersome can place substantial burdens on physicians and their staff, ultimately leading many to stop prescribing pain medications altogether. This forces patients to seek pain relief medications elsewhere, which may be much less convenient and familiar and may even be dangerous or illegal.
>
> *     *     *
>
> In some states, physicians who fail to consult prescription monitoring databases before prescribing pain medications for

---

[33] *About AfPA*, The Alliance for Patient Access, http://allianceforpatientaccess.org/ about-afpa/#membership (last visited May 8, 2018). References herein to APA include two affiliated groups: the Global Alliance for Patient Access and the Institute for Patient Access.

[34] Mary Chris Jaklevic, *Non-profit Alliance for Patient Access uses journalists and politicians to push Big Pharma's agenda*, Health News Review (Oct. 2, 2017), available at https://www.healthnewsreview.org/2017/10/non-profit-alliance-patient-access-uses-journalists-politicians-push-big-pharmas-agenda/ (hereinafter "Jaklevic, *Non-profit Alliance for Patient Access*").

[35] APA's board members, including Dr. Robert A. Yapundich, Dr. Jack D. Schim, and Dr. Howard Hoffberg, have also directly received funding from pharmaceutical companies including Mallinckrodt. *See* ProPublica's Dollars for Docs database, available at https://projects.propublica.org/docdollars/

[36] Prescription Pain Medication: Preserving Patient Access While Curbing Abuse, Institute for Patient Access (Oct. 2013), available at http://1yh21u3cjptv3xjder1dco9mx5s. wpengine.netdna-cdn.com/wp-content/uploads/2013/12/PT_White-Paper_Finala.pdf

[37] Prescription monitoring programs, such as the St. Louis County Prescription Drug Monitoring Program (or PDMP), serve to curb diversion by providing physicians with access to information regarding prescriptions of controlled substances patients have received during a certain period of time.

17

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

> their patients are subject to fines; those who repeatedly fail to
> consult the databases face loss of their professional licensure.
> Such penalties seem excessive and may inadvertently target older
> physicians in rural areas who may not be facile with computers
> and may not have the requisite office staff. Moreover, threatening
> and fining physicians in an attempt to induce compliance with
> prescription monitoring programs represents a system based on
> punishment as opposed to incentives. . . .
>
> We cannot merely assume that these programs will reduce
> prescription pain medication use and abuse.[38]

50.     The white paper also purports to express concern about policies that have been

enacted in response to the prevalence of pill mills:

> Although well intentioned, many of the policies designed to
> address this problem have made it difficult for legitimate pain
> management centers to operate. For instance, in some states, [pain
> management centers] must be owned by physicians or
> professional corporations, must have a Board certified medical
> director, may need to pay for annual inspections, and are subject
> to increased record keeping and reporting requirements. . . . [I]t is
> not even certain that the regulations are helping prevent abuses.[39]

51.     In addition, in an echo of earlier industry efforts to push back against what they

termed "opiophobia," the white paper laments the stigma associated with prescribing and taking

pain medication:

> Both pain patients and physicians can face negative perceptions
> and outright stigma. When patients with chronic pain can't get
> their prescriptions for pain medication filled at a pharmacy, they
> may feel like they are doing something wrong—or even criminal.
> . . . Physicians can face similar stigma from peers. Physicians in
> non- pain specialty areas often look down on those who specialize
> in pain management—a situation fueled by the numerous

---

[38] Prescription Pain Medication: Preserving Patient Access While Curbing Abuse, Institute for Patient Access (Oct. 2013), http://1yh21u3cjptv3xjder1dco9mx5s. wpengine.netdna-cdn.com/wp-content/uploads/2013/12/PT_White-Paper_Finala.pdf.
[39] Id. at 5-6.

18

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

regulations and fines that surround prescription pain medications.[40]

52.     In conclusion, the white paper advocates for the use of opioids for chronic pain, stating, "[p]rescription pain medications, and specifically the opioids, can provide substantial relief for people who are recovering from surgery, afflicted by chronic painful diseases, or experiencing pain associated with other conditions that does not adequately respond to over-the-counter drugs."[41]

53.     The APA also lobbies Congress directly. In 2015, the APA signed onto a letter supporting legislation proposed to limit the ability of the DEA to police pill mills by enforcing the "suspicious orders" provision of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. §801 et seq. ("CSA" or "Controlled Substances Act").[42] An internal U.S. Department of Justice ("DOJ") memo stated that the proposed bill "'could actually result in increased diversion, abuse, and public health and safety consequences'"[43] and, according to DEA Chief Administrative Law Judge John J. Mulrooney, the law would make it "all but logically impossible" to prosecute manufacturers and distributors, like Mallinckrodt here, in federal courts.[44] The law passed both houses of Congress and was signed into law in 2016. These efforts

---

[40] *Id.* at 6.

[41] *Id.* at 7.

[42] Letter from Alliance for Patient Access, et al., to Congressmen Tom Marino, Marsha Blackburn, Peter Welch, and Judy Chu (Jan.26, 2015), available at http://www.hoparx.org/images/hopa/advocacy/advocacy-activities/FINAL_Patient_ Access_Letter_of_Support_House_Bill.pdf.

[43] Bill Whitaker, Ex-DEA Agent: Opioid Crisis Fueled by Drug Industry and Congress, CBS News (Oct. 17, 2017), available at https://www.cbsnews.com/news/ex-dea-agent-opioid-crisis-fueled-by-drug-industry-and-congress/ (hereinafter, "Whitaker, Opioid Crisis Fueled by Drug Industry").

[44] John J. Mulrooney, II & Katherine E. Legel, Current Navigation Points in Drug Diversion Law: Hidden Rocks in Shallow, Murky, Drug-Infested Waters, 101 Marquette L. Rev.

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

to prevent the implementation of programs and statutes that are designed to prevent diversion are in direct contravention of Mallinckrodt's public claims that it is committed to fighting opioid misuse and preventing diversion.

54.    The U.S. Pain Foundation ("USPF") was another Front Group with systematic connections and interpersonal relationships with Mallinckrodt. The USPF was one of the largest recipients of contributions from the Mallinckrodt and other opioid makers, collecting nearly $3 million from opioid makers in payments between 2012 and 2015 alone. The USPF was also a critical component of Mallinckrodt's lobbying efforts to reduce the limits on over-prescription. The USPF advertises its ties to Mallinckrodt, listing opioid manufacturers like Mallinckrodt, as "Platinum," "Gold," and "Basic" corporate members.[45] Industry Front Groups like the American Academy of Pain Management, the American Academy of Pain Medicine, the American Pain Society, and PhRMA are also members of varying levels in the USPF.

55.    The USPF has made several misleading statements regarding opioids. For example, USPF claims that opioid treatment allows patients to function.[46] Additionally, Paul Gileno, the founder and president of the USPF, claimed that opioids allow people to "participate in daily life and be contributing members of society."[47] The USPF made further misleading statements, including statements that involve veterans. For example, the USPF website discusses recent opioid prescribing guidelines released by the Department of Veteran Affairs and Department of Defense.

---

(forthcoming Feb. 2018), available at https://www.documentcloud.org/documents/4108121-Marquette-Law-Review-Mulrooney-Legel.html.

[45] *Id.* at 12; Transparency, U.S. Pain Foundation, https://uspainfoundation.org/transparency/ (last accessed on March 9, 2018).

[46] U.S. Pain Foundation, New Coalition Calls for Balanced Approach to Opioids, available at https://uspainfoundation.org/news/new-coalition-calls-balanced-aproach-opioids/.

[47] *Id.*

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

The USPF describe these guidelines as "problematic" due to their advice to prescribe 20-50 morphine milligram equivalents ("MME") per day with caution, and their warning against prescribing more than 90 MEEs per day. The group also suggests untreated chronic pain creates a risk of suicide, and therefore physicians should not necessarily be cautious in prescribing opioids to those with suicidal ideation.[48]

**E.      Mallinckrodt Told Doctors that Opioids Could be Taken in Ever Higher Doses without Disclosing their Greater Risks.**

56.      Through third parties, Mallinckrodt falsely claimed to prescribers and consumers that opioids could be taken in ever-increasing strengths to obtain pain relief, without disclosing that higher doses increased the risk of addiction and overdose. This was particularly important because patients on opioids for more than a brief period develop tolerance, requiring increasingly high doses to achieve pain relief. Mallinckrodt apparently needed to generate a comfort level among doctors to ensure the doctors maintained patients on the drugs even at the high doses that became necessary.

57.      Through its funding of the website pain-topics.org, Mallinckrodt claimed that there is no ceiling dosage for opioids, and that dosage should be determined by starting on low dosages and titrating up until a patient finds relief. The website does not disclose the dangers associated with higher doses, but claims that risks associated with opioids, such as death, overdoses and accidents, occur when patients do not take opioids as prescribed, or when the patient is taking other drugs or substances unknown to the prescribing doctor.

58.      These claims conflict with the scientific evidence. Patients receiving high doses of opioids (e.g., doses greater than 100 mg morphine equivalent dose ("MED") per day) as part of

---

[48] U.S. Pain Foundation, VA Restricts Opioids for Veterans and Military Service Members, available at https://uspainfoundation.org/news/va-restricts-opioids-veteran/.

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

long-term opioid therapy are approximately nine times more likely to suffer overdose from opioid-related causes than those on low doses. As compared to available alternative pain remedies, scholars have suggested that tolerance to the respiratory depressive effects of opioids develops at a slower rate than tolerance to opioids' analgesic effects. Accordingly, the practice of continuously escalating doses to match pain tolerance can, in fact, lead to overdose even where opioids are taken as recommended.

59.     The CDC Guideline concludes that the "[b]enefits of high-dose opioids for chronic pain are not established" while "there is an increased risk for serious harms related to long-term opioid therapy that appears to be dose-dependent."[49] That is why the CDC advises doctors to "avoid increasing doses" above 90 mg MED.[50]

60.     In 2013, the FDA acknowledged "that the available data do suggest a relationship between increasing opioid dose and risk of certain adverse events" and that studies "appear to credibly suggest a positive association between high-dose opioid use and the risk of overdose and/or overdose mortality." A study of the Veterans Health Administration from 2004 to 2008 found the rate of overdose deaths is directly related to maximum daily dose.

**F.    Mallinckrodt Failed to Put into Place Proper Procedures to Report Suspicious Orders of Opioids.**

61.     Through its misleading marketing, Mallinckrodt, on information and belief, created a larger market for opioids in Missouri. Until at least 2007, Mallinckrodt deceptively promoted opioids through the website it funded, pain-topics.org. From 2008 until present, Mallinckrodt then

---

[49]  CDC Guideline at 9 and 22. The 2016 CDC Guideline reinforces earlier findings announced by the FDA. In 2013, the FDA acknowledged "that the available data do suggest a relationship between increasing opioid dose and risk of certain adverse events." For example, the FDA noted that studies "appear to credibly suggest a positive association between high-dose opioid use and the risk of overdose and/or overdose mortality."

[50]  CDC Guideline at 16.

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

compounded this harm by failing to put in place appropriate procedures to ensure suspicious orders would be reported and instead, continuing to fill orders which supplied far more opioids than were justified. Each of Mallinckrodt's shipments of opioids into the stream of commerce in Missouri that were fulfilled without an adequate system in place to investigate, report, and refuse to fill orders that they knew or should have known were suspicious, violated both its common law duties and statutory duties under Missouri law.

62.     Under the common law, Mallinckrodt had a duty to exercise reasonable care in selling dangerous narcotic substances. Any time Mallinckrodt filled and failed to report orders that it knew or should have known were likely being diverted for illicit uses, Mallinckrodt breached that duty and created and failed to prevent a foreseeable risk of harm to Missouri residents. In addition, Mallinckrodt had a duty, when speaking publicly about opioids and its efforts to combat diversion, to speak accurately and truthfully.

63.     Mallinckrodt has several responsibilities with respect to suspicious orders of opioids. First, it must set up a system designed to detect such orders. That would include reviewing its own data, relying on its observations of prescribers and pharmacies, and following up on reports or concerns of potential diversion. Second, it must refuse to fill suspicious orders and only fill orders flagged as potentially suspicious if, after conducting due diligence, it can determine that the order is not likely to be diverted into illegal channels. And, third, all suspicious orders must be reported to relevant enforcement authorities.

64.     The purpose of the reporting rules is to create a "closed" system intended to reduce the diversion of these drugs out of legitimate channels into the illicit market, while at the same

23

time providing the legitimate drug industry with a unified approach to narcotic and dangerous drug control.[51]

66. Mallinckrodt was well aware it had an important role to play in this system, and also knew or should have known that its failure to comply with its reporting obligations would have serious consequences.

66. In a letter to registrants, including Mallinckrodt, on December 27, 2007, the DEA reminded Mallinckrodt that, as a registered manufacturer of controlled substances, it shares, and must abide by, statutory and regulatory duties to "maintain effective controls against diversion" and "design and operate a system to disclose to the registrant suspicious orders of controlled substances."[52] The DEA's December 27, 2007 letter reiterated the obligation to detect, report, and not fill suspicious orders and provided detailed guidance on what constitutes a suspicious order and how to report (e.g., by specifically identifying an order as suspicious, not merely transmitting data to the DEA). Finally, the letter references the Revocation of Registration issued in Southwood Pharmaceuticals, Inc., 72 Fed. Reg. 36,487-01 (July 3, 2007), which discusses the obligation to report suspicious orders and "some criteria to use when determining whether an order is suspicious."[53]

67. 2011, the DEA began to investigate Mallinckrodt after DEA investigators noted large amounts of Mallinckrodt's oxycodone being sent to Florida. The investigation resulted in a fine of $35 million for Mallinckrodt's failure to report suspicious orders of controlled substances, including opioids, and for violating recordkeeping requirements. The Department of Justice and

---

[51] *See* 1970 U.S.C.C.A.N. 4566, 4571-72.

[52] *See* Letter from Joseph T. Rannazzisi, Deputy Assistant Adm'r, Office of Diversion Control, Drug. Enf't Admin., U.S. Dep't of Justice, to Cardinal Health (Dec. 27, 2007), filed in *Cardinal Health, Inc. v. Holder*, No. 1:12-cv-00185-RBW (D.D.C. Feb. 10, 2012), ECF No. 14- 8.

[53] *See* 2007 Rannazzisi Letter.

24

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

DEA determined that Mallinckrodt ignored its responsibility to report suspicious orders of as many as 500 million of its pills that were sent to Florida from 2008 to 2012, which was 66% of all oxycodone sold in the state. According to the Washington Post, an internal summary of the federal case against Mallinckrodt found that "Mallinckrodt's response was that 'everyone knew what was going on in Florida but they had no duty to report it.'"[54]

68.    In the press release accompanying the settlement, the Department of Justice stated that Mallinckrodt "did not meet its obligations to detect and notify DEA of suspicious orders of controlled substances such as oxycodone, the abuse of which is part of the current opioid epidemic. These suspicious order monitoring requirements exist to prevent excessive sales of controlled substances, like oxycodone . . . . Mallinckrodt's actions and omissions formed a link in the chain of supply that resulted in millions of oxycodone pills being sold on the street. . . . 'Manufacturers and distributors have a crucial responsibility to ensure that controlled substances do not get into the wrong hands' . . ."[55]

69.    Among the allegations resolved by the settlement, the government alleged "Mallinckrodt failed to design and implement an effective system to detect and report 'suspicious orders' for controlled substances—orders that are unusual in their frequency, size, or other patterns . . . [and] Mallinckrodt supplied distributors, and the distributors then supplied various U.S.

[54] The Government's Struggle to Hold Opioid Manufacturers Accountable: Sixty-Six Percent of All Oxycodone Sold in Florida Came from This Company. But the DEA's Case Against It Faltered, Wash. Post, (Apr. 2, 2017), available at https://www.washingtonpost.com/graphics/investigations/dea-mallinckrodt/?utm_term=.256b39de1578.
[55] See Press Release, U.S. Dep't of Justice, Mallinckrodt Agrees to Pay Record $35 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs and for Recordkeeping Violations (July 11, 2017), available at https://www.justice.gov/opa/pr/mallinckrodt-agrees- pay-record-35-million-settlement-failure-report-suspicious-orders.

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

pharmacies and pain clinics, an increasingly excessive quantity of oxycodone pills without notifying DEA of these suspicious orders."[56]

70.    The 2017 Mallinckrodt MOA further details the DEA's allegations regarding Mallinckrodt's failures to fulfill its legal duties as an opioid manufacturer:

> With respect to its distribution of oxycodone and hydrocodone products, Mallinckrodt's alleged failure to distribute these controlled substances in a manner authorized by its registration and Mallinckrodt's alleged failure to operate an effective suspicious order monitoring system and to report suspicious orders to the DEA when discovered as required by and in violation of 21 C.F.R. § 1301.74(b). The above includes, but is not limited to Mallinckrodt's alleged failure to:
>
>     i. conduct adequate due diligence of its customers;
>
>     ii. detect and report to the DEA orders of unusual size and frequency;
>
>     iii. detect and report to the DEA orders deviating substantially from normal patterns including, but not limited to, those identified in letters from the DEA Deputy Assistant Administrator, Office of Diversion Control, to registrants dated September 27, 2006 and December 27, 2007:
>
>         1.    orders that resulted in a disproportionate amount of a substance which is most often abused going to a particular geographic region where there was known diversion,
>
>         2.    orders that purchased a disproportionate amount of a substance which is most often abused compared to other products, and
>
>         3.    orders from downstream customers to distributors who were purchasing from multiple different distributors, of which Mallinckrodt was aware;
>
>     iv. use "chargeback" information from its distributors to evaluate suspicious orders. Chargebacks include downstream purchasing information tied to certain discounts, providing Mallinckrodt with data on buying patterns for Mallinckrodt products; and

---

[56] *Id.*

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

> v. take sufficient action to prevent recurrence of diversion by
> downstream customers after receiving concrete information of
> diversion of Mallinckrodt product by those downstream
> customers.[57]

71.     In connection with the settlement, Mallinckrodt admitted that "[a]s a registrant

under the CSA, Mallinckrodt had a responsibility to maintain effective controls against diversion,

including a requirement that it review and monitor these sales and report suspicious orders to

DEA."[58] Mallinckrodt further stated that it "recognizes the importance of the prevention of

diversion of the controlled substances they manufacture" and agreed that it would "design and

operate a system that meets the requirements of 21 CFR 1301.74(b) . . . [such that it would] utilize

all available transaction information to identify suspicious orders of any Mallinckrodt product."[59]

Mallinckrodt specifically agreed "to notify DEA of any diversion and/or suspicious circumstances

involving any Mallinckrodt controlled substances that Mallinckrodt discovers."[60]

72.     Mallinckrodt also acknowledged that at certain times prior to January 1, 2012,

certain aspects of its "system to monitor and detect suspicious orders did not meet the standards

outlined in letters from the DEA Deputy Administrator, Office of Diversion Control, to registrants

dated September 27, 2006 and December 27, 2007."[61]

73.     Mallinckrodt, through its internal sources, knew or should have known that some

of the millions of pills it ignored its responsibility to report were being used to fill suspicious orders

---

[57] Administrative Memorandum of Agreement between the United States Department of Justice,
the Drug Enforcement Agency, and Mallinckrodt, plc. and its subsidiary Mallinckrodt, LLC
(July 10, 2017), available at https://www.justice.gov/usao-edmi/press-
release/file/986026/download.
("2017 Mallinckrodt MOA"), at 2-3.

[58] *Id.* at 1.

[59] *Id.* at 4.

[60] *Id.*

[61] *Id.*

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

in Florida, and knew or should have known that those opioids were being diverted to other states. DOJ prosecutors found that Mallinckrodt knew of DEA enforcement actions against distributors for failing to report the disproportionately large amounts of painkillers they were shipping to retail customers in Florida and other states. Moreover, Mallinckrodt recognized in November 2010 that 68% of the purchases by one of its distributors, Cincinnati-based KeySource Medical, Inc., were for prescription opioids, and that 91% of this customer's purchasers were sent to Florida.[62]

74.     Mallinckrodt also had other information that would have alerted it to potential diversion. Mallinckrodt acknowledged that "[a]s part of their business model Mallinckrodt collects transaction information, referred to as chargeback data, from their direct customers (distributors). The transaction information contains data relating to the direct customer sales of controlled substances to 'downstream' registrants." As part of the settlement, Mallinckrodt agreed that, from this data, it could and would "report to the DEA when Mallinckrodt concludes that the chargeback data or other information indicates that a downstream registrant poses a risk of diversion."[63] While the 2017 settlement arose out of Mallinckrodt's failure to report suspicious orders in Florida, upon information and belief, it is indicative of a systemic failure that continues to this day, not only in Florida, but in Missouri as well.

75.     Mallinckrodt claims on its website to be "committed both to helping health care providers treat patients in pain and to fighting opioid misuse and abuse," and further asserts that: "In key areas, our initiatives go beyond what is required by law. We address diversion and abuse

---

[62] United States' Opposition to Plaintiff's Motion for a Preliminary Injunction, *KeySource Medical Inc. v. Holder*, No. 1:11-cv-00393, Doc. 9 at 6 (S.D. Ohio June 30, 2011).
[63] *Id.*

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

through a multidimensional approach that includes educational efforts, monitoring for suspicious orders of controlled substances . . ."[64]

76.      These public statements create the false and misleading impression that Mallinckrodt has rigorously carried out its duty to report suspicious orders and to exercise due diligence to prevent diversion of these dangerous drugs, and also worked voluntarily to prevent diversion as a matter of corporate responsibility. The truth, of course, is that Mallinckrodt failed to put in place appropriate procedures to ensure suspicious orders would be reported and instead, continued to fill suspicious orders, which supplied far more opioids than were justified and led to diversion of opioids in Missouri and other states. Furthermore, far from trying to address diversion, Mallinckrodt worked to defeat programs and laws designed to prevent diversion through its sponsorship of APA and USPF.

**G.      Mallinckrodt Fueled and Profited from a Public Health Epidemic That Has Significantly Harmed Missouri Residents.**

77.      Upon information and belief, the vast market for opioids was created and sustained, in significant part, by Mallinckrodt's deceptive marketing in establishing opioids as a first-line treatment for chronic pain. Mallinckrodt's deceptive marketing caused patients to believe they would not become addicted, addicted patients to seek out more drugs, and health care providers to make and refill opioid prescriptions that maintain dependence and addiction. In addition, Mallinckrodt fueled the opioid epidemic in Missouri by failing to put in place appropriate procedures to ensure suspicious orders would be reported and instead, continuing to fill orders that it knew or should have known were suspicious, which supplied far more opioids than were justified. Each of Mallinckrodt's shipments of opioids into the stream of commerce in Missouri

---

[64]  Mallinckrodt website, Our Programs, available at
http://www2.mallinckrodt.com/Responsibility/Responsible_Use/Our_Programs/

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

without an adequate system in place to investigate, report, and refuse to fill orders that they knew or should have known were suspicious, violated both its common law duties and its statutory duties under Missouri law.

78.     Mallinckrodt's marketing, and especially its detailing to doctors, have been effective. The effects of sales calls on prescribers' behavior is well-documented in the literature, including a 2017 study that found that physicians ordered fewer promoted brand-name medications and prescribed more cost-effective generic versions if they worked in hospitals that instituted rules about when and how pharmaceutical sales representatives were allowed to detail prescribers. The changes in prescribing behavior appeared strongest at hospitals that implemented the strictest detailing policies and included enforcement measures. Another study involved the research of four different practices which included visits by sales representatives, medical journal advertisements, direct-to-consumer advertising, and pricing, and found that sales representatives have the strongest effect on driving drug utilization. An additional study found that doctor meetings with sales representatives are related to changes in doctor prescribing practices and requests by physicians to add the drugs to hospitals' formularies. Mallinckrodt necessarily expected a return on its investment in opioid marketing, and carefully calibrated its promotion efforts to serve that end.

79.     Mallinckrodt devoted substantial resources to its marketing efforts. Publicly available data shows that Mallinckrodt sales representatives visited prescribers 872 times in 2017 alone.

80.     Representing the NIH's National Institute of Drug Abuse in hearings before the Senate Caucus on International Narcotics Control in May 2014, Dr. Nora Volkow explained that "aggressive marketing by pharmaceutical companies" is "likely to have contributed to the severity of the current prescription drug abuse problem."

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

81.     In August 2016, U.S. Surgeon General Vivek Murthy published an open letter to be sent to physicians nationwide, enlisting their help in combating this "urgent health crisis" and linking that crisis to deceptive marketing.[65] He wrote that the push to aggressively treat pain, and the "devastating" results that followed, had "coincided with heavy marketing to doctors . . . . [m]any of [whom] were even taught—incorrectly—that opioids are not addictive when prescribed for legitimate pain."[66]

82.     Scientific evidence demonstrates a strong correlation between opioid prescriptions and opioid abuse. For example, a 2007 study found "a very strong correlation between therapeutic exposure to opioid analgesics, as measured by prescriptions filled, and their abuse."[67] In a 2016 report, the CDC explained that "[o]pioid pain reliever prescribing has quadrupled since 1999 and has increased in parallel with [opioid] overdoses." Prescription opioids and heroin account for the majority of overdoses. For these reasons, the CDC concluded that efforts to improve the safer prescribing of opioids must be intensified "to reverse the epidemic of opioid drug overdose deaths and prevent opioid-related morbidity."

83.     The FDA also has made clear that "most opioid drugs have 'high potential for abuse,'" and "the serious risks of misuse, abuse, neonatal opioid withdrawal syndrome (NOWS), addiction, overdose, and death [are] associated with the use of ER/LA opioids overall, and during pregnancy." According to the FDA, because of the "known serious risks" associated with extended-release opioid use, including "risks of addiction, abuse, and misuse, even at

---

[65] CDC, *Examining the Growing Problems of Prescription Drug and Heroin Abuse* (Apr. 29, 2014), available at http://www.cdc.gov/washington/testimony/2014/t20140429.htm; Vivek H. Murthy, *Letter from the Surgeon General*, August 2016, available at http://turnthetiderx.org.
[66] *Id.*

[67] Theodore J Cicero et al., Relationship Between Therapeutic Use and Abuse of Opioid Analgesics in Rural, Suburban, and Urban Locations in the United States, 16.8 Pharmacoepidemiology and Drug Safety, 827-40 (2007).

31

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

recommended doses, and because of the greater risks of overdose and death," opioids should be used only "in patients for whom alternative treatment options" like non-opioid drugs have failed. (Emphasis added.)

84.     Most opioid addiction begins with legitimately prescribed opioids. An estimated 60% of the opioids that are abused come, directly or indirectly, through physicians' prescriptions. A study of 254 accidental opioid overdose deaths in Utah found that 92% of the decedents had been receiving prescriptions from health care providers for chronic pain. Sales to patients who doctor-shop (or visit multiple doctors to hide illicit or over-use) constitute approximately only 1% to 2% of opioid volume.

85.     Upon information and belief, the escalating number of opioid prescriptions written by doctors who were deceived by Mallinckrodt's deceptive marketing scheme, along with Mallinckrodt's failure to put in place appropriate procedures to ensure suspicious orders would be reported and instead its continuing to fill orders which supplied far more opioids than were justified, caused a correspondingly dramatic increase in opioid addiction, overdose, and death throughout Missouri.

86.     Addiction has consumed the lives of countless Missourians exposed to opioids prescribed by doctors either directly, from their own prescriptions, or indirectly, from prescription drugs obtained by others and found in family medicine cabinets. It is difficult to describe the lifelong struggle and costs individuals addicted to opioids will face. The desire to get drugs becomes so consuming that addicts can no longer work or care for their children and will resort to desperate means to persuade doctors to provide their next prescription—even pulling their own teeth.

87.     Because heroin is cheaper than prescription painkillers, many prescription opioid addicts migrate to heroin when they can no longer get access to or afford the pills. Mallinckrodt also could have foreseen, and did foresee, that users who become addicted to a particular prescription opioid, such as Exalgo and Xartemis XR, would migrate to another drug (including heroin) if those drugs become less expensive or more readily available. In fact, some users migrate to heroin (sometimes with fentanyl) they buy on the street. Nationally, roughly 80% of heroin users previously used prescription opioids.

88.     Overdose deaths are only one consequence. Opioid addiction and misuse also result in an increase in emergency room visits, emergency responses, and emergency medical technicians' administration of naloxone—the antidote to opioid overdose.

89.     Rising opioid use and abuse have negative social and economic consequences far beyond overdoses. According to a 2016 study by a Princeton economist, the increase in opioid prescriptions from 1999 to 2015 could account for roughly 20% of the decline in labor force participation for men and 25% for women. Two-thirds of the surveyed men not in the labor force said they took prescription painkillers—compared to just 20% of employed men. Many of those taking painkillers still said they experienced pain daily.

90.     The abuse of opioids, including opioids manufactured by Mallinckrodt, and the resulting increase in heroin use and addiction have caused outbreaks of HIV, chronic Hepatitis C, and TTP. In 2016 the CDC published a report which listed the top counties in the nation that are at risk of spreading HIV and Hepatitis C due to injecting drugs. Of the top 220 counties, 13 were located in Missouri.[68] One researcher who has tracked 503 drug users since 2008 found that 70% of them have contracted Hepatitis C.

---

[68]  https://www.cdc.gov/pwid/vulnerable-counties-data.html.

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

91.     Even infants have not been immune to the impact of opioid abuse. There has been a dramatic rise in the number of infants who are born addicted to opioids due to prenatal exposure and suffer from Neonatal Abstinence Syndrome ("NAS"). These infants painfully withdraw from the drug once they are born, cry nonstop from the pain and stress of withdrawal, experience convulsions or tremors, have difficulty sleeping and feeding, and suffer from diarrhea, vomiting, and low weight gain, among other serious symptoms. The long-term developmental effects are still unknown, though research in other states has indicated that these children are likely to suffer from continued serious neurologic and cognitive impacts, including hyperactivity, attention deficit disorder, lack of impulse control, and a higher risk of future addiction. When untreated, NAS can be life-threatening.

92.     According to the CDC, between 1999 and 2014, sales of opioids nearly quadrupled. In 2012 alone, approximately 259 million opioid prescriptions were written in the United States. For context, the adult population of the United States is approximately 250 million. Thus, there may be nearly ten million more opioid prescriptions written each year than there are adults in the United States.

93.     Countless individuals have become addicted to opioids as a result of the use of opioids for chronic-pain treatment, often with tragic results. In 2012, more than two million Americans were abusing or dependent on opioids. Since 1999, approximately 183,000 Americans died from opioid-related overdoses, and tens of thousands of those overdose deaths occurred in Missouri. In 2014, more than 60% of drug-overdose deaths nationally involved opioids, and more than 62,000 Americans are believed to have fatally overdosed from opioids in 2017 alone.

94.     The opioid epidemic has a terrible human cost. In 2016, opioids were responsible for 1,901 overdose deaths in Missouri.

34

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

95.     These deaths represent the tip of the iceberg. According to 2009 data, for every overdose death that year, there were nine abuse treatment admissions, 30 emergency department visits for opioid abuse or misuse, 118 people with abuse or addiction problems, and 795 non-medical users.

96.     Each year, opioid abuse imposes approximately \$55 billion in health and social costs across the country, and it also imposes approximately \$20 billion in costs for emergency and inpatient care.

97.     While the use of opioids has taken an enormous toll on Missouri residents, Mallinckrodt has realized millions of dollars in revenue from use of its opioids for chronic pain as a result of its deceptive, unfair, and unlawful conduct.

**H.      Mallinckrodt Fraudulently Concealed its Misconduct.**

98.     Mallinckrodt made, promoted, and profited from its misrepresentations about the risks and benefits of opioids for chronic pain even though it knew that its marketing was false and misleading. The history of opioids, as well as research and clinical experience over the last 20 years, established that opioids were highly addictive and responsible for a long list of very serious adverse outcomes. Mallinckrodt had access to scientific studies, detailed prescription data, and reports of adverse events, including reports of addiction, hospitalization, and deaths—all of which made clear the harms from long-term opioid use and that patients are suffering from addiction, overdoses, and death in alarming numbers. More recently, the FDA and CDC have issued pronouncements based on existing medical evidence that conclusively exposes the known falsity of these misrepresentations.

99.     Notwithstanding this knowledge,. at all times relevant to this Complaint, Mallinckrodt took steps to avoid detection of and to fraudulently conceal its deceptive marketing

35

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

and unlawful and fraudulent conduct. Mallinckrodt disguised its role in the deceptive marketing of chronic opioid therapy by funding and working through unbranded marketing, third party advocates, and professional associations.

100.    In addition, Mallinckrodt affirmatively assured the public, and state and local governments, that it was working to prevent diversion and to curb opioid use and abuse. Yet, it failed to prevent diversion and worked in the shadows through Front Groups to undermine programs and statutes designed to combat the epidemic.

101.    Mallinckrodt thus successfully concealed from the medical community and patients facts sufficient to arouse suspicion of the claims that Plaintiff now asserts.

## I.    Missouri Purchasers of Health-Care Insurance Have Sustained Substantial Harm Due to the Defendants' Misconduct.

102.    Health insurance is an individual or group policy that provides coverage for hospital, medical, surgical, and/or prescription drug benefits.

103.    The Defendants' misconduct has increased Plaintiff's cost of private health insurance in Missouri.

104.    In Missouri, the cost of coverage has increased significantly since 2011. Since 2011, the annual cost of coverage per individual has increased by an estimated 235.9 percent to $7,051 in the individual market. The cost of coverage in the large employer market (or employers with 50 or more employees) increased less rapidly, and even decreased during two of the last seven years. Between 2011 and 2017, cost per insured increased by a 5.9 percent.

105.    Nearly one-third (32.4%) of Missouri residents had coverage from at least one public program, while slightly over 70 percent (70.6%) was insured by private or commercial coverage ("group participants") at some point in 2017.

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

106.    Considering all sources of payment, including public insurance programs and out-of-pocket spending, health care costs have risen at a rate significantly higher than the overall rate of inflation. Between 1991 and 2014, total health costs in Missouri have increased nearly four-fold, from $13.0 billion to $49.1 billion. On a per capita basis and in constant 2014 dollars, annual costs have nearly doubled, rising from $4,194 to $8,107 per year per person. The most rapid cost increases over this period are related to home health care and medications, both of which increased by an annual average of 4.8 percent above the overall rate of inflation. The largest two cost categories are hospital and physician services.

107.    Group participants may pay all or part of the premium directly, or their employers may pay all or part of the premium directly. Individual purchasers (or members of their family) pay the entire premium directly. The "deductible" in a health-insurance plan is the amount the insured must pay each period (usually annually) before insurance starts to cover healthcare costs. A "co-pay" is a flat amount the insured pays per claim, such as a doctor visit or prescription. "Co-insurance" is the percentage of a bill that the insured pays under some plans after the deductible is met. Deductibles and co-payments often are higher under individual plans.

108.    As a direct and proximate result of the conduct described herein, natural and corporate persons have sustained losses and injuries in the form of higher premiums, deductibles, and co-payments/co-insurance. Health care insurers in Missouri have paid (and expect to continue to pay) substantial amounts for opioid prescriptions that would never have been prescribed and/or filled absent Defendants' misconduct, and have also paid (and expect to continue to pay) substantial amounts for treatment of individuals who became addicted to opioids and/or who became addicted to heroin or other drugs because of opioid use. Many of those individuals who became addicted to opioids—or who became addicted to heroin or other drugs because of opioid

37

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

use—would never have become addicted or even received access to opioids absent the Defendants' conduct described herein. These insurers have also paid for numerous other costs proximately caused by the Defendants' conduct, including care for babies born addicted to opioids, emergency-room treatments, and other claims.

109.    Plaintiff purchasers of private health insurance have been damaged as a result of paying prices that are higher as a direct result of the Defendants' misconduct. Missouri health insurers are easily able to—and do—pass higher costs onto their insureds. Premiums in health insurance markets do not reflect individual differences in costs, meaning that all insureds bear higher costs inflicted by the highest-risk insureds.

110.    In Missouri, as in most other states, insurers charge premiums based on assigned rate classes, a pool of insured individuals with similar health status. Because the premium charged is uniform for the entire risk class, excessive claims experienced by others raise premiums for everyone. This empirical reality makes economic sense. Insurers cannot know *ex ante* if an individual insured will take and become addicted to opioids, with the corresponding costs that ensue for that patient. So, insurers charge every insured a higher premium—including the majority of insureds who never take opioids—to pay for the risk of future, opioid-related claims.

111.    This is partially because insured patients with opioid abuse or dependence diagnoses cost health insurers more than average patients, in Missouri and nationwide. In 2015, total annual per-patient charges (the costs of providing a health service) and allowed amounts (the maximum an insurer will pay for a covered health service) for services for patients with opioid abuse and dependence diagnoses were 550% higher than for the average insured patient.

112.    Thus, as the opioid crisis has barreled forward across the country and in Missouri, so has the pressure on insurance companies to raise premiums. Indeed, by one estimate, private

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

insurance claims related to opioid dependence rose by an astonishing 3,200% nationwide from 2007 to 2014, and upon information and belief by a comparable percentage in Missouri, with the brunt of this burden falling on those aged 19 to 35. This makes sense in light of the demonstrated increase in opioid-related emergency room visits and treatment center admissions, along with the growth in the percentage of privately insured Americans and Missourians over this period. Similarly, professional charges and allowed amounts grew by over 1,000% for patients diagnosed with opioid abuse or dependence from 2011 to 2015, further increasing insurance companies' incentive to increase their customers' rates.

113.    The costs that the Defendants' conduct inflicted on the insurance market cannot be and have not been confined to opioid users because of such risk pooling. Empirical evidence evaluated by leading economists confirms this common-sense conclusion. In addition, many of the costs that the Defendants have inflicted on the health system involve risks that insurers may not refuse to cover as a matter of law and regulation, since Missouri is like "all states [that] have mandated certain benefits that must be included in the health insurance package of that state, most commonly for substance abuse."[69]

## J.    Defendants Acted Wantonly, Willfully, Outrageously, and with Reckless Disregard for the Consequences of Their Actions.

114.    When engaging in the conduct described herein, Mallinckrodt acted wantonly, willfully, outrageously, and with reckless disregard for the consequences of their actions.

115.    Mallinckrodt knew and should have known about these harms that their unlawful and unfair business practices have caused and continue to cause in Missouri. Defendants closely monitored their sales and the habits of prescribing doctors. Their sales representatives, who visited

---

[69] Jonathan Gruber and Helen Levy, (2009). The Evolution of Medical Spending Risk, JOURNAL OF ECONOMIC PERSPECTIVES, 23(4), pp. 25-48, at 32.

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

doctors and attended CMEs, knew which doctors were receiving their messages and how they were responding. Mallinckrodt knew—and, indeed, intended—that their misrepresentations would persuade doctors in Missouri to prescribe and patients in Missouri to use their opioids for chronic pain. Defendants also had access to and watched carefully government and other data that tracked the explosive rise in opioid use, addiction, injury, and death.

116.    At all relevant times, Defendants knew that the likely consequences of their actions would be that millions of individuals would become addicted to opioids and other drugs, which in turn would destroy countless families and communities across the nation and in Missouri, while imposing tremendous medical and other costs that would be borne by all purchasers of health insurance.

117.    Despite this knowledge, Defendants engaged in the conduct described herein for the purpose of obtaining billions of dollars in windfall profits, while destroying the lives of countless Missourians.

118.    Defendants' actions are not excused by the fact that their drug labels may have allowed or did not exclude the use of opioids for chronic pain. FDA approval of opioids for certain uses did not give license to misrepresent the risks and benefits of opioids. Indeed, Defendants' misrepresentations were directly contrary to pronouncements by and guidance from the FDA based on the medical evidence and their own labels.

119.    Nor is Defendants' causal role broken by the involvement of doctors. Mallinckrodt's marketing efforts were ubiquitous and highly persuasive. Their deceptive messages tainted virtually every source doctors could rely on for information and prevented them from making informed treatment decisions. Defendants also were able to harness and hijack what

40

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

doctors wanted to believe—namely, that opioids represented a means of relieving their patients' suffering and of practicing medicine more compassionately.

120.    While insurance companies may refuse to cover ineffective or dangerous treatments, they too were misled by Defendants' pervasive campaign to convince the healthcare industry that opioids were effective and necessary for long-term pain management. Insurers paid Defendants for the care ordered by patients' doctors, as well as for the resulting costs of addiction: treatment, emergency-room care, and other claims. Those costs were ultimately passed along to Plaintiff and all Class Members.

### FACTS SPECIFIC TO PLAINTIFF

121.    Plaintiff is a natural person and resident and citizen of the State of Missouri.

122.    Since at least 2014, Plaintiff has purchased health insurance, through the U. S. Postal Service, from GEHA Government Employees Health Association.

123.    In 2014, Plaintiff paid a monthly premium—for Plaintiff and his spouse—of $166.05.

124.    In 2015, Plaintiff paid a monthly premium—for Plaintiff and his spouse—of $206.12.

125.    In 2016, Plaintiff paid a monthly premium—for Plaintiff and his spouse—of $496.51.

126.    In 2017, Plaintiff paid a monthly premium—for Plaintiff and his spouse—of $509.36.

127.    In 2018, Plaintiff paid a monthly premium—for Plaintiff and his spouse—of $522.62.

41

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

128.    In 2019, Plaintiff paid a monthly premium—for Plaintiff and his spouse—of $535.73.

### CLASS ALLEGATIONS

129.    **Class Definition**: Plaintiff brings this action pursuant to Rule 52.08 of the Missouri Rules of Civil Procedure on behalf of himself and a Class of similarly situated individuals, defined as follows:

> All current Missouri citizens (including natural persons and entities) who purchased health insurance policies in Missouri from 1996 through the present; and all current Missouri citizens who paid for any portion of employer-provided health insurance from 1996 through the present.

Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current, former, purported, and alleged employees, officers, and directors; (3) counsel for Plaintiff and Defendants; (4) persons who properly execute and file a timely request for exclusion from the Class; (5) the legal representatives, successors, or assigns of any such excluded persons; and (6) all persons who have previously had claims similar to those alleged herein finally adjudicated or who have released their claims against Defendants.

130.    **Numerosity**: The exact number of Class members is unknown to Plaintiff at this time, but it is clear that individual joinder is impracticable. As of 2014, the Centers for Medicare and Medicaid Services estimated that almost four million people in Missouri enrolled in private health insurance. Ultimately, the Class members will be easily identified through third-party business records.

42

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

131. **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the Class, and those questions predominate over any questions that may affect individual Class members. Common questions for the Class include, but are not necessarily limited to the following:

- whether Defendants made material misrepresentations regarding the benefits and risks of their products;

- whether Defendants acted intentionally with respect to the foregoing;

- whether Defendants were negligent in the distribution of their products;

- whether Defendants acted in violation of state and federal law;

- whether the Class is entitled to restitution and/or disgorgement, in addition to, or as a substitute for, damages under Missouri law; and

- whether Plaintiff is entitled to damages and/or injunctive relief.

132. **Typicality**: Plaintiff's claims are typical of the claims of all the other Class members. Plaintiff and the other Class members sustained substantially similar damages as a result of Defendants' uniform wrongful conduct, based upon the same interactions that were made uniformly with Plaintiff and the other Class members.

133. **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the other Class members. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the Class members and have the financial resources to do so. Neither Plaintiff nor his counsel has any interest adverse to those of the other Class members.

43

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

134. **Policies Generally Applicable to the Class**: Defendants have acted and failed to act on grounds generally applicable to Plaintiff and the other Class members, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class.

135. **Superiority**: This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all parties is impracticable. The damages suffered by individual Class members will likely be relatively small compared to the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' actions. Thus, it would be virtually impossible for individual Class members to obtain effective relief from Defendants' misconduct. Even if Class members could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered and uniformity of decisions ensured.

136. Plaintiff reserves the right to revise the Class Definition and Class Allegations based on further investigation, including facts learned in discovery.

### CAUSES OF ACTION

**COUNT I:**
**Violations of Missouri Merchandising Practices Act,**
**Mo. Rev. Stat. Ann. § 407.010, et seq.**

137. Plaintiff repeats, reiterates, and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

44

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

138.  Plaintiff brings this Count on behalf of all members of the Class, i.e. all current Missouri citizens (including natural persons and entities) who purchased health insurance policies in Missouri from 1996 through the present; and all current Missouri citizens who paid for any portion of employer-provided health insurance from 1996 through the present

139.  The Missouri Merchandising Practices Act prohibits the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce or the solicitation of any funds for any charitable purpose."

140.  Defendants' business practices as described in this Complaint are deceptive, unconscionable, and violate Missouri law because the practices deceived doctors, insurers, and consumers in Missouri, led to the sale of opioids that should not have been sold, and thereby caused Plaintiff and other Class members to pay higher insurance premiums.

141.  Defendants knew and should have known at the time of making or disseminating these statements, or causing these statements to be made or disseminated, that such statements were false, misleading, deceptive and unconscionable. Their omissions, which are deceptive and misleading in their own right, render even seemingly truthful statements about opioids false and misleading. All of this conduct, separately and collectively, was likely to deceive Missouri doctors, who prescribed opioids based on the Defendants' deception, and insurers who purchased, or covered the costs for the purchase of, opioids for chronic pain.

142.  In addition, the Defendants were in the position to implement effective business practices to guard against diversion of the highly-addictive opioid products they manufacture and sell. They repeatedly purported to have done so. But those representations were untrue. Instead,

45

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

they profited off the opioid epidemic by flouting anti-diversion laws, while burdening Missouri consumers by their conduct and profiting from the sale of prescription opioids in quantities that far exceeded the number of prescriptions that could reasonably have been used for legitimate medical purposes, despite having notice or actual knowledge of widespread opioid diversion from prescribing records, pharmacy orders, field reports, and sales representatives. All while purporting to have world-class and compliant systems, controls, and practices.

143.    Defendants' fraudulent, unlawful, and/or deceptive activity alleged herein caused insurers to pay for ineffective and dangerous treatments, as well as the increased costs associated with opioid addiction. Those costs were passed on to Plaintiff and members of the Class in the form of increased insurance premiums.

144.    As a direct and proximate result of the foregoing acts and practices, Defendants have received, or will receive, income, profits, and other benefits, which they would not have received if they had not engaged in the violations described in this Complaint.

### COUNT II:
**Public Nuisance**

145.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

146.    Missouri law prohibits Defendants from causing "any unreasonable interference with common community rights such as the public health, safety, peace, morals or convenience."

147.    Defendants have created or assisted in the creation of a condition that is injurious to the health and interferes with the comfortable enjoyment of life and property of the Plaintiff and the other Class members.

46

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

148.    The public nuisance is substantial and unreasonable. Defendants' actions caused and continue to cause the public health epidemic described above, and that harm outweighs any offsetting benefit.

149.    Defendants knew and should have known that their promotion of opioids was false and misleading and that their deceptive marketing scheme and other unlawful, unfair, and fraudulent actions would create or assist in the creation of the public nuisance—*i.e.*, the opioid epidemic. Defendants' actions were, at the very least, a substantial factor in opioids becoming widely available and widely used. Their actions were, at the very least, a substantial factor in deceiving doctors and patients about the risks and benefits of opioids for the treatment of chronic pain.

150.    Without Defendants' actions, opioid use, misuse, abuse, and addiction would not have become so widespread, and the opioid epidemic that now exists would have been averted or much less severe.

151.    Defendants' actions have increased the cost of insuring individuals, and Plaintiff and the other Class Members—who pay insurance premiums—are injured.

152.    The public nuisance—*i.e.*, the opioid epidemic—created, perpetuated, and maintained by Defendants can be abated and further recurrence of such harm and inconvenience can be abated.

153.    Plaintiff requests an order providing for abatement of the public nuisance that Defendants created or assisted in the creation of, and enjoining Defendants from future violations of Missouri law.

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

## COUNT III:
### Unjust Enrichment

154.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

155.    To the detriment of Plaintiff and other Class members, Defendants have been, and continue to be, unjustly enriched as a result of the unlawful and/or wrongful conduct alleged herein.

156.    Defendants have voluntarily accepted and retained the inflated prices paid for their opioid products with full knowledge that they were not lawfully entitled to it.

157.    Plaintiff and other Class members bear the costs of the benefits conveyed to all Defendants in the form of increased insurance premiums.

158.    Between Defendants and Plaintiff/Class members, it would be unjust for Defendants to retain the benefits attained by their wrongful actions.

159.    Defendants have been unjustly enriched, in the form of inflated prices, at the expense of Plaintiff and other Class members who are entitled in equity to disgorgement and restitution of Defendants' wrongful profits, revenue, and benefits, to the extent, and in the amount deemed appropriate by the Court, and any other relief the Court deems just and proper to remedy Defendants' unjust enrichment.

## COUNT IV:
### Negligence

160.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

161.    Defendants have a duty to exercise reasonable care in manufacturing and distributing highly dangerous medications in the State of Missouri.

48

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

162.    Defendants owe that duty to Plaintiff and other Class Members. Defendants' profits as manufacturers are inextricably bound with the industry of health insurance, and any reasonably prudent manufacturer is aware of the basic mechanics of the insurance industry by which costs are passed on to others in a risk pool through premiums.

163.    Defendants knew and should have known that misleading doctors and insurers about the safety and efficacy of opioids for long-term pain treatment would cause significant costs, not just to those for whom opioids were an ineffective and dangerous treatment, but to insurers that absorb healthcare costs, and thus ultimately to insurance customers.

164.    Defendants breached their duty to Plaintiff and other Class Members through their false and misleading promotion of opioids and their deceptive marketing scheme, misrepresenting the nature of the drugs and aggressively promoting them for chronic pain.

165.    Defendants' conduct caused opioids to become widely available and widely used, and Defendants' actions were, at the very least, a substantial factor in the widespread abuse of opioids. Without Defendants' actions, opioid use, misuse, abuse, and addiction would not have become so widespread, and the opioid epidemic that now exists would have been averted or much less severe.

166.    As described above, Defendants' breach caused and proximately caused damages to Plaintiff and other Class Members.

<div align="center">

**COUNT V:**
**Civil Conspiracy**
**(Missouri Common Law)**

</div>

167.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

<div align="center">49</div>

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

168. Defendants, in a scheme to improperly market and expand the sales of their opioid products, conspired with other drug manufacturers, distributors and pharmacies to create the scenario where sales of their opioid products would lead to widespread opioid use, misuse, abuse, and addiction, resulting in the opioid epidemic that now exists.

169. The unlawful actions of Defendants and other drug manufacturers, distributors and pharmacies resulted in extensive damages to Plaintiff and other Class members for which Defendants should be liable.

### COUNT VI:
### Fraud and Fraudulent Misrepresentation

170. Plaintiff repeats, reiterates, and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

171. Defendants violated their general duty not to actively deceive and have made knowingly false statements and have omitted and/or concealed information which made statements Defendants did make knowingly false. Defendants acted intentionally and/or unlawfully.

172. Defendants falsely minimized the risks of opioids, overstated their benefits, and generated far more opioid prescriptions than there should have been.

173. Defendants' false and misleading statements deceived doctors and patients about the risks and benefits of opioids and convinced them that opioids were not only appropriate, but *necessary* to treat chronic pain.

174. Defendants' false and misleading marketing of the benefits of its abuse-deterrent opioids influenced prescribers to discount evidence of opioid addiction and abuse and attribute it to other, "less safe" opioids—thereby prolonging the opioid epidemic.

175. By funding Front Groups, Defendants were able to exercise control over their false and deceptive messages. Defendants acted through the Front groups to deceptively promote the use

50

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

of opioids for the treatment of chronic pain, and to press for policies and legislation that would advance its interests.

176. Through third parties, Defendants falsely claimed to prescribers and consumers that opioids could be taken in ever-increasing strengths to obtain pain relief, without disclosing that higher doses increased the risk of addiction and overdose.

177. Defendants' public statements create the false and misleading impression that they have rigorously carried out their duty to report suspicious orders and to exercise due diligence to prevent diversion of these dangerous drugs, and also worked voluntarily to prevent diversion as a matter of corporate responsibility. The truth, of course, is that Defendants failed to put in place appropriate procedures to ensure suspicious orders would be reported and instead continued to fill suspicious orders, which supplied far more opioids than were justified and led to diversion of opioids in Missouri and other states. Furthermore, far from trying to address diversion, Defendants worked to defeat programs and laws designed to prevent diversion through its sponsorship of APA and USPF.

178. Defendants made, promoted, and profited from their misrepresentations about the risks and benefits of opioids for chronic pain even though it knew that their marketing was false and misleading.

179. Notwithstanding this knowledge, at all times relevant to this Complaint, Defendants took steps to avoid detection of and to fraudulently conceal its deceptive marketing and unlawful and fraudulent conduct. Defendants disguised their role in the deceptive marketing of chronic opioid therapy by funding and working through unbranded marketing, third party advocates, and professional associations.

51

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

180.    Defendants knew and should have known at the time of making or disseminating statements about their opioid products, or causing these statements to be made or disseminated, that such statements were false, misleading, deceptive and unconscionable. Their omissions, which are deceptive and misleading in their own right, render even seemingly truthful statements about opioids false and misleading. All of this conduct, separately and collectively, was likely to deceive Missouri doctors, who prescribed opioids based on the Defendants' deception, and insurers who purchased, or covered the costs for the purchase of, opioids for chronic pain.

181.    Defendants engaged in fraudulent, false, and misleading promotion of opioids and their deceptive marketing scheme, misrepresenting the nature of the drugs and aggressively promoting them for chronic pain.

182.    Plaintiff and other Class members seek all legal and equitable relief as allowed by law, except as expressly disavowed herein, including *inter alia* injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by the Distributor Defendants, attorney fees and costs, and pre- and post-judgment interest.

## PRAYER FOR RELIEF

183.    Plaintiff, on behalf of himself and the Class, respectfully requests that this Court enter an Order:

184.    Declaring that the claims brought by Plaintiff may be maintained as a class action;

185.    Declaring that Defendants have engaged in unlawful, fraudulent, deceptive, and unconscionable business acts and practices in violation of the Missouri Merchandising Practices Act;

186.    Ordering Defendants to pay restitution of any money acquired by their unlawful, fraudulent, deceptive, and unconscionable business practices;

52

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

187. Declaring that Defendants have created a public nuisance and enjoining Defendants to abate the public nuisance that they created.

188. Declaring that Defendants have been unjustly enriched by their conduct;

189. Ordering Defendants to pay restitution of all benefits and disgorge all profits unjustly retained by Defendants;

190. Declaring that Defendants have acted negligently;

191. Ordering Defendants to pay all damages caused to Plaintiff and Class Members by their negligent actions;

192. Declaring that Defendants have engaged in a conspiracy;

193. Ordering Defendants to pay all damages caused to Plaintiff and other Class members by their conspiratorial actions;

194. Declaring that Defendants engaged in fraudulent actions;

195. Ordering Defendants to pay all damages caused to Plaintiff and other Class members by their fraudulent actions;

196. Awarding treble and punitive damages as appropriate;

197. Awarding injunctive relief as necessary to protect the interests of Plaintiff and the Class;

198. Awarding Plaintiff and the other Class members their reasonable litigation expenses and attorneys' fees;

199. Awarding Plaintiff and the other Class members pre- and post-judgment interest, to the extent allowable; and

200. Awarding such other and further relief as equity and justice may require.

# EXHIBIT A

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

## JURY TRIAL DEMANDED

201.    Plaintiff demands a jury trial for all claims so triable.

Respectfully submitted,

**ROBERT RUTH**, individually and on behalf of all others similarly situated,

Dated: May 23, 2019                     By:  /s/ Charles F. Speer

One of Plaintiff's Attorneys

Charles F. Speer – MO Bar # 40713
cspeer@speerlawfirm.com
SPEER LAW FIRM, P.A.
104 West 9th Street, Suite 400
Kansas City, Missouri 64105
Tel: 816.472.3560

William S. Consovoy*
will@consovoymccarthy.com
Thomas R. McCarthy*
tom@consovoymccarthy.com
CONSOVOY MCCARTHY PARK PLLC
3033 Wilson Boulevard, Suite 700
Arlington, Virginia 22201
Tel: 703.243.9423

Ashley Keller*
ack@kellerlenkner.com
Travis Lenkner*
tdl@kellerlenkner.com
Seth Meyer*
sam@kellerlenkner.com
KELLER LENKNER LLC
150 North Riverside Plaza, Suite 2570
Chicago, Illinois 60606
Tel: 312.741.5220

James Young*
jyoung@ForThePeople.com
MORGAN & MORGAN

54

Electronically Filed - Jackson - Kansas City - May 23, 2019 - 03:49 PM

COMPLEX LITIGATION GROUP
76 South Laura Street, Suite 1100
Jacksonville, Florida 32202
Tel: 904.398.2722

John A. Yanchunis*
jyanchunis@ForThePeople.com
Patrick A. Barthle II*
pbarthle@ForThePeople.com
Juan Martinez*
juanmartinez@ForThePeople.com
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
201 North Franklin Street, 7th Floor
Tampa, Florida 33602
Tel: 813/223-5505
*Pro Hac Vice admission to be sought

*Counsel for Plaintiff and the Putative Class*

55